**SO ORDERED.**

**SIGNED this 22 day of April, 2005.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **MILK PALACE DAIRY, LLC** | ) | **Case No. 03-16743** |
| | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

Creditor Amarillo National Bank (ANB) filed its Second Amended Plan of Reorganization on December 22, 2004 (Plan).[1] Metropolitan Life Insurance Company (Met) objects to confirmation of ANB's Plan, principally to the manner in which ANB's plan deals with Met's claim. Met made a conditional election under 11 U.S.C. § 1111(b)(2), provided it is deemed to be undersecured.[2] ANB filed

_____

[1] Dkt. 497.

[2] Dkt. 468.

its motion for cram down confirmation on February 7, 2005.[3]  The Court heard evidence in support of

confirmation of the plan on February 23, 2004 and closing arguments on March 1, 2005.  After careful

consideration, the Court is prepared to rule.

Also before the Court was the debtor's motion to sell ten (10) outlying tracts of real estate at public

auction on March 8, 2005 pursuant to 11 U.S.C. § 363(f), to which Met also objected.[4]  This motion was

granted in open court on March 1, 2005 and an order has been entered.[5]

<u>Jurisdiction</u>

This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §

157(b)(2)(L).

<u>Factual Background</u>

Debtor filed this chapter 11 case on December 15, 2003.[6]  Debtor operates a dairy facility near

Syracuse, Kansas.  It is comprised of both a freestall facility (Milk Palace I) and a dry lot facility (Milk

Palace II).   Debtor continues to operate the dairy as debtor-in-possession.   Debtor's ownership is

multifaceted and disparate.  Approximately one-half of the interest in Milk Palace is owned by MDR

Management, L.L.C., which is owned in part by Hatcher family interests, and in part by Mike and Julie

Spini.  Mr. Spini was the former manager of the dairy and was discharged prior to the bankruptcy filing

---

[3]  Dkt. 549.  ANB's subsequently amended its motion for cram down confirmation. Dkt. 556.

[4]  Dkt. 493 and Dkt. 520.

[5]  Dkt. 564.

[6]  Unless otherwise noted, all statutory references are to the Bankruptcy Code, Title 11, U.S.C.
§ 101 *et seq.*

after the dairy and ANB discovered a massive shortfall of cows. Dave McCarty replaced Spini and has served as manager of the dairy since late November, 2003.

Because of the fractious nature of the ownership, it was and remains unlikely that ownership will ever coalesce around a plan of reorganization. Accordingly, ANB took it upon itself to file its Plan that provides for the establishment of a Liquidating Trust which would hold and operate the dairy in hopes of selling it as a going concern within one year.[7] Under the Plan, if the property does not sell in that time period, the Trust is directed to consider an auction sale of the property. Met has also filed a Plan which provides for a similar sale except that all of the property would be sold in one unit.[8] As noted above, ANB's Plan anticipated the sale of the ten outlying tracts ("outlots") not adjacent to the dairy at or about the time of confirmation.

Met holds a first mortgage lien in all of the real estate of the debtor, including the debtor's two dairy facilities. Met also claims a second security interest in debtor's dairy and irrigation equipment, behind ANB and purchase-money lenders, as well as an assignment of milk runs. Met's filed claim, as of the date of the petition, December 15, 2003, was $9,994,477.78. Met has steadfastly alleged that it is an oversecured creditor, yet, pursuant to an early-filed agreed order in this case, Met has received "adequate protection" payments of $60,378.82 monthly since April 7, 2004.[9] This payment was to represent monthly accruing interest on Met's note at the contract rate of 7.30 per cent. Met received a scheduled installment payment

---

[7] Met contends, and ANB conceded at trial, that the dairy operations will not cash flow much beyond one year without additional capital infusion or borrowing.

[8] Dkt. 499.

[9] Dkt. 224.

3

of $79,340.83 in December, 2003 as a result of milk runs, but declared its note in default and accelerated

same on January 20, 2004, after the January monthly scheduled payment was missed. During the pendency

of the case, Met has also received a lease payment made on its collateral as well as some proceeds of the

foreclosure sale of a home on the farm and a §363 sale of real estate (Tract 17) in October 2004.[10]  In all,

Met has received since filing, approximately $1,150,359 without considering a payment of $17,600 which

is in debtor's counsel trust account pending the further order of this Court.[11]  Met's paramount perfected

position in the real estate and affixed equipment is unquestioned.  Met also perfected a second security

interest in irrigation equipment as well as some non-affixed dairy equipment by filing financing statements.

Met's interest in the milk runs may also be perfected, but it is clearly subordinate to ANB's lien.

Under ANB's Plan, Met would receive payments of interest based on a fixed rate equal to the

prime rate plus 1 per cent, this rate to be fixed as of the date of the confirmation order.  Debtor would

make these payments for the first six months after confirmation.  If the dairy is not sold at the end of six

months, monthly principal and interest payments based on a 25-year amortization at the same rate will be

payable until the dairy is sold.  The Plan also provides for a balloon payment of the remaining principal and

interest due at 10 years after confirmation.

Met objects to ANB's Plan on several grounds.[12]  Met first asserts that it is oversecured and, by

virtue of debtor's post-petition payment default, is entitled to collect default interest on its loan at 16% per

_____

[10]  Dkt. 324 and 305.

[11]  $1,150,359.52 = $724,541.04 (12 adequate protection payments) + $79,340.83 (milk
runs) + $33,696.14 (lease payment) + $46,625.29 (foreclosure sale of home) + $266,156.22 (sale of
tract 17).  The $17,600 being held are the remaining sale proceeds from the sale of tract 17.

[12]  Dkt. 463, Dkt. 531 and Dkt. 557.

4

annum. Second, Met objects to the sale of the ten outlots (its collateral) as violating its mortgage's sale clause.[13] Third, Met asserts that the debtor and the Trust will be unable to maintain dairy operations beyond one year's time, rendering the Plan not feasible. Finally, Met argues that if it is undersecured, it has filed a timely election to have its claim treated as fully secured under §1111(b)(2) and that the Plan does not provide an appropriate treatment of Met's claim under §1129(b). Met's is the only unresolved objection to confirmation, but, because of that, all of the provisions of §1129(a) are not met (viz., that all impaired classes have accepted the Plan, §1129(a)(8)), and, as a result, the Court must determine whether Met's treatment under this plan is fair and equitable in under §1129(b)(2)(A)). Met's other objections relate to the Plan's purported injunction against third parties pursuing guaranty obligations and to ANB's right to vote MDR's interest under a state court charging order.

<u>Valuation</u>

Determining whether Met is entitled to oversecured treatment requires the Court to determine the amount of Met's claim at the date of the petition under §502 and the extent to which it was secured at the time of the confirmation hearing under §506(a). Section 502 (b) states that the Court shall determine "the amount of such claim . . . as of the date of the filing of the petition . . . ." Section 506(a) states that the value of a secured creditor's security is to be determined in light of its proposed disposition or use and "in conjunction with any hearing . . . on a plan affecting such creditor's interest." As required by §506(b), Met's allowed claim will include interest as well as reasonable attorneys fees and expenses, up to the value of Met's collateral *if* that collateral value exceeds the amount of Met's claim.

---

[13] Dkt. 520.

At the date of filing, Met was owed $9,994,477.78[14] and its claim (secured and unsecured) should be allowed in that amount. Met's claim is secured by Met's first mortgage on real estate and its second security interest in non-dairy equipment and milk proceeds.[15] If the value of Met's collateral exceeds $9,994,477.78, Met is entitled to add accruing interest as well as reasonable attorneys' fees and expenses, up to the value of the collateral itself.[16]

At trial, ANB and Met each presented highly detailed appraisals of the dairy facilities and land. ANB offered the report and testimony of Tom Gergens and Met offered the report and testimony of Donna Hutcheson. In preparing their reports, both appraisers spent time at the dairy and reviewed a variety of comparative sales or other transactions involving dairies, several of which were mentioned in both reports. Their conclusions were starkly different. Gergens appraised the dairy at $8.46 million.[17] Hutcheson appraised it at $10.15 million,[18] a disparity of some $1.69 million. Gergens appraised the outlying lots at approximately $757,000 but no formal report of that appraisal was offered. Instead, ANB informed the Court that it accepted Hutcheson's appraisal of $822,000 as the value of these outlying lots. The Court accepted that stipulation.

The appraisers did agree on two elements: one, that the status of the water rights serving the

---

[14] Claim No. 1.

[15] Met's first lien on the real property is subject only to delinquent real estate ad valorem taxes which, as to the dairy, amount to some $97,334.16 plus interest. The plan provides for the orderly payment of the tax claims.

[16] 11 U.S.C. § 506(b).

[17] Ex. 8 and 9.

[18] Ex. A.

6

dairy is in question and, two, that necessary waste disposal permits must be obtained from the KDHE. If those issues are not resolved, both Hutcheson and Gergens agreed that the dairy will suffer significant diminution in value.

The dairy has operated for years on an appropriation certified by the Chief Engineer of the Kansas Division of Water Resources (KDWR) according *irrigation* water rights as opposed to *stock* water rights. A change in these rights could be effected with the Chief Engineer if other interested users consent, but several witnesses indicated that an adjacent landowner and user, Noble Melencamp, has refused to consent, leaving the fate of the stock water rights to the KDWR in the first instance and the Kansas courts in the second. While both appraisers as well as the dairy's water consultant Gary Baker opined that the water rights issue could be resolved, none ventured a guess concerning the length of time involved. In the Court's experience, if state court litigation is the final resort, a delay of more than one year could develop.

Because dairies produce massive quantities of effluent, waste disposal is an issue. The lagoons at Milk Palace need repair. Further, Milk Palace I and Milk Palace II operate under separate disposal permits that are insufficient to accommodate the capacity of the dairy according to Hutcheson. If the outlots are sold and unavailable for waste disposal, Milk Palace will need to obtain easements from neighbors covering sufficient acreage for waste disposal. In the Court's view, the stock water rights and waste disposal issues are negatives for the dairy's value. Nevertheless, both appraisers valued the dairy on the basis that it had or will have sufficient stock water rights and solid waste disposal permits to operate legally. This enables the Court to compare "apples to apples," but to the extent that the dairy has neither valid water rights nor appropriate waste disposal permits, these "apples" are only hypothetical fruit.

Gergens based his valuation on physical attributes of the facility, attributing a value per cow

7

(whether in milk or dry) that the dairy can accommodate. Hutcheson valued the dairy based on a per milk cow capacity. Because milk cow capacity is to a great degree dependent on management practices, Hutcheson's hypothesized management changes greatly increase her view of the capacity of the dairy beyond that estimated by Gergens (as well as current management).

Gergens's appraisal of value is based on the number of "lock ups," pen rails through which one cow can be fed. He reasons that a dairy operation can only accommodate one cow per lockup. Because lockups are hard assets one can see and count, a valuation based upon them is, according to Gergens, more accurate than one that is based on milking cow capacity which is, in turn, driven by a variety of operational and management considerations.[19]

Hutcheson's appraisal of value is based on a "per milk cow" number. Drawing on the practices of other dairies, Hutcheson relies on certain management assumptions to determine that the dairy can accommodate some 5,800 milk cows as opposed to Gergens's conclusion that only 5,000 milk cows can be utilized. Hutcheson's operating assumptions are based on reducing the time the cows spend on the milking carousel from eight minutes, as Milk Palace currently operates, to seven minutes.[20] She also reasons that 85% of the milking cows can be milked every day while Milk Palace's manager Dave McCarty testified that the dairy actually operates at an 80 percent efficiency.[21] Finally, she urges that

---

[19] While Milk Palace I's permit allows for a capacity of 5,000, there are only 3,400 head locks. Milk Palace II's permit allows a capacity of 3,000 but there are 3,200 head locks.

[20] Milk Palace utilizes a 60 stall milking carousel, milking three times per day. Manager Dave McCarty testified that the cows are not completely milked using a 7 minute rotation.

[21] Hutcheson suggested that the higher efficiency could be obtained by better training of the cows on the carousel. According to McCarty, an 80% efficiency is the industry average for rotary milking carousels like Milk Palace operates.

8

milking operations should run 21 hours per day instead of the current 22 hours per day.[22]  With respect

to the dry lot facility (Milk Palace II), Hutcheson assumes a higher crowding factor than that used at Milk

Palace I.  She assumes that cows may be crowded into pens at 120 percent of pen capacity as opposed

to the 113 percent crowding used at Milk Palace I.  Each management change makes a significant

difference in the number of milk cows that can hypothetically be run through the dairy.

Because Hutcheson's resulting value is based on milking parameters different from those in place

at Milk Palace (and instituted by Dave McCarty, the manager), she has effectively factored management

into the valuation, something which she, in her own testimony, says an appraiser should not do.  This is in

essence a liquidation plan that does not contemplate retention of the property by the debtor and the current

management may not remain in place.  The Court concludes that management practices should be factored

out of the equation as much as possible.

The appraisers each used comparative sales to set the market for dairies in southwestern Kansas.

The universe of comparative transactions is very diverse.  At least three of the comparable sales are

foreclosure or lender sales, one with a Farm Credit Bank carryback mortgage loan.  Several of the

comparables are of nearly-new facilities.  One comparable sale is in Indiana, which is subject to a different

Federal Marketing Order.[23]  Indeed, on two of the comparative sales, the two witnesses could not even

agree on the sale price.  In short, the market for dairies is very diverse.

Cross examination exposed some troubling inconsistencies and anomalies in Hutcheson's report.

---

[22]  Milk Palace I runs 22 hours per day of milking.  Milk Palace II runs less – 19 hours per day,
due to allowance for milking the hospital cows at Milk Palace II.

[23]  McCarty testified that the nation is divided into several Federal Marketing Order territories
in which the Department of Agriculture applies differing price controls to the raw milk supply.  Those
price controls may vary from territory to territory.

The Court notes that Hutcheson certified that she alone completed the appraisal work without significant professional assistance. Yet she testified that her husband, Gary Hutcheson, who is also an appraiser, did a substantial amount of work on the appraisal and she relied heavily upon his expertise for the cost approach to value. The report indicates that Ms. Hutcheson visited all of the comparative sale locations. She testified, however, that she had not visited the Indiana location and that her evaluation of it was based on viewing photographs.

In addition, Hutcheson's "stabilized value" addendum,[24] apparently made at Met's counsel's insistence that distress sales should be eliminated from the process entirely, is not helpful here because "distress" has animated the resale dairy market over the last several years. What the Court needs to know to address the confirmation of this Plan is what a knowledgeable willing buyer would pay to a willing seller for this facility. This Court simply cannot believe that an informed buyer would disregard in his or her bidding the presence of distressed properties in the market.

Most damaging to Hutcheson's appraisal is her variation of management assumptions that renders her report far more speculative than Gergens's "hard count" approach. As can be seen from the Appendix, wet or milk cow capacity can change dramatically when any one of the factors (rotation time, efficiency percentage, and hours worked) changes. While the Court fears that the absence of valid water rights and waste permits makes both these appraisals somewhat speculative, Gergens's approach is more credible than Hutcheson's and the Court therefore concludes that it is more likely than not that his report is the most accurate portrayal of the dairy's value. Gergens's appraisal is the least speculative, relies on a "hard asset" analysis that takes management variance out of the equation, and contains far fewer inconsistencies.

---

[24] Ex. B.

10

Other than the introduction by ANB of a liquidation analysis document assigning values to some of the dairy's equipment, there was no evidence in the record concerning the separate value of the irrigation systems, other than as cost factors in the analysis of the appraisers.[25]  Therefore, the Court assumes that the value of the irrigation equipment is included in the land values.  As Met did not introduce any evidence to the contrary, the Court cannot attribute any value to Met's second lien in non-dairy equipment.

Thus, for claims allowance and confirmation purposes, the Court values the dairy at $8.46 million. While the Court concedes that the facility might well be worth more, given its previous statements concerning the infirmities in the Hutcheson report, there is no competent record before the Court that would justify the setting of a range of values without engaging in unwarranted speculation.  Adding the agreed value of the outlots to be sold at auction –  $822,000, the value of Met's collateral, subject only to a deduction for past due ad valorem taxes, is $9,282,000.[26]  Gergens's uncontested testimony was that the value of the dairy remained the same during the pendency of the case.  At the petition date, Met's secured claim would have been allowed in that amount.[27]   Met is, therefore, undersecured as of the date of filing and not entitled to the benefits of §506(b).

<u>Met's §1111(b) Election and Treatment</u>

As an undersecured creditor, Met's timely §1111(b) election entitles it to be treated as fully secured in the allowed amount of its claim, $9,994,477.78.   Therefore, for ANB's Plan to be fair and

---

[25]  Exhibit 17.  *See also* Exhibit A, p. 3.

[26]  By the time this opinion is issued, the outlots will have been sold at auction and their actual value, net taxes and selling costs, will have been remitted to Met or Met will have credit bid.  For distribution purposes, the auction result will control.  The $822,000 valuation controls only for the purpose of allowing Met's secured claim.

[27]  11 U.S.C. § 506(a).

equitable as required by §1129(b)(2)(A), Met must receive a stream of payments having a present value equal to the value of its collateral, initially $9.282 million, but the aggregate amount of that stream of payments must be equal to Met's allowed claim, initially $9,994,477.78. But for the payment by the debtor to Met of the adequate protection and sales proceeds prior to confirmation, determining whether the proposed treatment complies with §1129(b)(2)(A) would be a fairly simple matter of financial calculation.

Met raises a number of issues in its plan objection. Met first asserts that reducing the value of its collateral by applying the payments as credits on the secured claim would accomplish a "strip-down" of its lien and deprive Met of the benefit of its collateral. This stripping would violate the policy behind §1111(b)(2) and would result in "other creditors . . . reap[ing] the excess [of the dairy's value over the adjusted secured claim] to the detriment of Met Life."[28] According to Met, this is an objectionable outcome because (1) §1111(b) is intended to preserve a creditor's entire claim and enabling the sale of the creditor's collateral for less than the value of the claim defeats that purpose; and (2) Met would be deprived of the right to enforce its mortgage in accordance with its terms. Arguing that §1111(b) affords an undersecured creditor relief from the ravages of §506(a), Met asserts that ANB's proposal of making a stream of monthly payments until the dairy is sold, and then paying the remainder of Met's claim in full is a "trap" that denies Met the benefit of any "upside" by diverting what proceeds remain to the unsecured creditors.

Met further argues that "[because] interest payments are awardable to the extent of the value of the collateral under a §1111 (b) election, the adequate protection payments received by MetLife should

_____

[28] Dkt. 530, p. 9.

12

be treated as credits against the interest accrued post petition so MetLife is treated as fully secured." [29]

Met also states that the proposed Plan "forces MetLife into a corner" by leaving it with one possible outcome whether it accepts a bifurcated treatment of its allowed secured claim as a §506(a) valuation of its collateral would require or whether it elects fully-secured status under §1111(b)(2) because, so Met says, either choice will result in Met receiving the same amount of money.

Met's election is timely and valid. The value of the collateral securing its claim is far from inconsequential[30] and there is no definite or certain provision for sale of the property.[31]

In addressing Met's arguments, a brief appreciation of the meaning and effect of §1111(b)(2), and its relationship to §506(a) and §1129 (b)(2) is in order. We start with the language of §1111(b) itself:

(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if--

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

---

[29] Dkt. 530, p. 11.

[30] *See* 11 U.S.C. § 1111(b)(2)(B)(i).

[31] *See* 11 U.S.C. § 1111(b)(2)(B)(ii). The Plan merely provides that the property will be sold within a certain time period and does not indicate to whom or how. *See* 4 William L. Norton, *Bankruptcy Law & Practice, 2nd. Ed.*, § 89:6 (2005) (hereafter "Norton").

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, *such claim is a secured claim to the extent that such claim is allowed*. (Emphasis added.).

Subsection (b)(1) allows a non-recourse secured creditor, one who has contracted only to have recourse against its collateral, and not against the maker of the obligation, to be treated as recourse irrespective of the terms of the agreement. Thus, even the holder of a non-recourse claim secured by collateral may assert an unsecured claim against the bankruptcy estate for that amount of its claim in excess of the value of its collateral. Subsection (b)(1)(A) merely provides that unless a valid (b)(2) election is made or if the property is to be sold under the plan or the claim holder has no recourse under its agreement, the claim is allowed as though the holder had recourse. Subsection (b)(1)(B) defines who may not elect fully secured treatment under subsection (2). The Court is content that Met may indeed elect §1111(b)(2) treatment.

Subsection (b)(2) effectively bypasses §506(a) bifurcation of secured claims by providing that an elector's claim is deemed secured to the extent it is allowed. Plainly put, this means that Met is deemed to be secured to the extent of $9,994,477.78, the allowed amount of its entire claim. By electing to be treated as fully secured, Met has foregone the benefit of any unsecured claim. The purpose of this provision is to protect creditors from having their secured claims crammed down at inopportune times, i.e. when the value of their collateral is, due to market or other conditions, low. As the court in *In re Stanley* has noted:

Outside of bankruptcy, if the owner wanted to retain the property after the mortgage went into default it would either have to work out a satisfactory resolution of the mortgage with the lender or bid on the property at a public foreclosure sale. Section 1111(b) puts Chapter 11 debtors to the same choice of either paying off the debt or forfeiting the

14

property, and thereby allows the debtor to retain the property and effectuate its reorganization, but without frustrating the lienholder's rights. By giving the lienholder recourse against the debtor personally for the amount of any deficiency, § 1111(b) provides the lienholder the benefit it would otherwise obtain from its nonrecourse loan bargain--i.e., either full payment (or at least a claim against the estate for the full amount of the debt and the ability to vote on the plan to the extent of its claim), or the right to foreclose and bid on the property at public auction.[32]

Section 1111(b)(2) effectively affords an undersecured creditor a substitute for credit bidding in cases where the creditor may expect the value of the collateral to increase, but the plan provides for the debtor to retain the property. It affords the creditor a means of preserving whatever "upside" may exist in the property by forcing the debtor to pay the entire debt in full to retain the property.[33]

Having elected this status, the secured creditor is entitled, in cramdown under § 1129(b)(2)(A)(II), to receive "on account of such [secured] claim deferred cash payments *totaling at least the allowed amount* of such [secured claim], of a value, *as of the effective date* of the plan, of at least the value of such holder's interest in the estate's interest in such property." In this case, had there been no adequate protection or proceeds liquidation payments, a fair and equitable treatment of Met's secured claim would be straightforward. Met would receive a stream of payments totaling $9,994,477.78, and the stream of payments would have to have a present value of not less than $9,282,000.00, the value of Met's collateral as established today.[34]

ANB proposes to apply to the paying down of Met's claim all of the post-petition payments leaving

---

[32] 185 B.R. 417, 426 (Bankr. D. Conn. 1995).

[33] *Id.*

[34] *See* Norton, § 89:4 ("A creditor that has made the Code § 1111(b)(2) election must, pursuant to the plan of reorganization, receive payments totaling its allowed claim, but the present value of the aggregate amount of the payments, determined as of the effective date of the plan, need only equal the value of the collateral determined as of such date.")

15

a balance on the claim, before selling and applying the proceeds of the outlots, of some $8,826,517.96. ANB also proposes that the balance of the secured "portion" of Met's claim, the $9,282,000, also be paid down, dollar for dollar, by the adequate protection and proceeds payments already made. Met complains that this strips its lien and deprives it of the benefits of § 1111(b)(2) by forcing it to accept under the plan less than the full value of its security. But this argument is simply without factual or legal basis.

First, outside bankruptcy, Met would never be entitled to more than its claim plus interest and fees accrued to the date of payment, whether or not its collateral appreciated in value. In bankruptcy, this amount would be limited by the operation of § 506(b) by the value of its collateral. Here, the Court has determined that the value of Met's collateral is less than its claim which means that, as of the date of the petition, Met was not entitled to collect any interest or fees.[35] Second, while Met's contractual right to default interest would be enforceable outside the bankruptcy context, its demand for default interest in this case is the result of a post-petition default and acceleration which likely violated the automatic stay.[36] Third, Met has, despite its loudly touted oversecured position, demanded and accepted "adequate

---

[35] *See* 11 U.S.C. § 502(b)(2) and § 506(b); *United Sav. Ass'n of Texas v. Timbers of Inwood*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed. 2d 740 (1988); *In re Donahue*, 110 B.R. 41 (Bankr. D. Kan. 1990).

[36] *See* In *In re Kansas Personal Communication Services, Ltd.*, 252 B.R. 179 (Bankr. D. Kan. 2000) (The automatic stay precluded the FCC from cancelling the debtor's licenses postpetition after debtor failed to make its quarterly installment payment on the licenses); *In re PCH Associates*, 122 B.R. 181 (Bankr. S.D.N.Y. 1990) (Noting that a postpetition acceleration of chapter 11 debtor's note would have been null and void as violation of automatic stay); *In re Garcia*, 276 B.R. 627 (Bankr. D. Ariz. 2002) (Absent stay relief, the Bank is precluded from exercising its option to accelerate); *First Bank Investors' Trust v. Tarkio College* 129 F.3d 471 (8th Cir. 1997) (Automatic stay prevented the creditor from taking any affirmative action to accelerate maturity of note; defaulted promissory note was never accelerated to trigger the 16% post-maturity interest rate.).

16

protection" throughout the case's duration notwithstanding that the value of its collateral has not declined.[37]

Indeed, Gergens opined that there had been no decline in the collateral value during the bankruptcy. The post-petition monthly payments received by Met were characterized as interest and calculated as such. But, as was settled by the Supreme Court in *Timbers*, Met had no right to post-petition interest on its undersecured claim.[38]

Therefore, what has transpired here is that Met has received some $884,203.60, mostly as interest, which would otherwise have remained in the debtor's coffers to fund operations, repay the post-petition operating debt, or distribute to other creditors. Other than interest accumulating on property taxes, Met has required no "protection." Accordingly, for Met to retain these funds without reducing the secured portion of its claim accordingly would be the same as granting Met a premium, at the expense of the estate and the junior classes of claims and interests. Further, after the petition date, the debtor sold a tract of real estate (Tract 17) netting proceeds of $283,756.22 (Tract 17) and remitted to Met funds in the amount of $266,156.22.[39] Because some of Met's collateral has been sold and Met has received the proceeds, its claim and secured claim should be further reduced by $283,756.22.[40]

---

[37] Only recently have the parties recognized the debtor's ongoing failure to pay ad valorem taxes. These unpaid taxes are priming liens on the property and their ongoing accrual of interest and penalties does diminish Met's secured position, suggesting to the Court that it would have been entitled only to adequate protection in an amount equal to the ongoing accruals and taxes coming due.

[38] 108 S.Ct. 626, 634.

[39] The remaining sale proceeds of $17,600 are held in debtor's counsel's trust account but are to be paid over to Met.

[40] This would amount to a total deduction of $1,167,959.82 comprised of the "adequate protection" payments ($724,541.04), milk runs ($79,340.83), lease payment ($33,696.14), foreclosure sale of house ($46,625.59), and sale of real estate (Tract 17) ($283,756.22).

17

The Court holds that all of the payments received by Met post-petition must be credited not only against Met's claim, but also against the secured portion of its claim. This is only logical. If Met had been undersecured and its collateral had deteriorated during the case, the adequate protection would have compensated it in whole or in part for that loss. Norton suggests that " [i]f the collateral is depreciating, the payment is appropriate and should be applied to the creditor's prepetition secured claim since the secured claim was decreasing post-petition as the value of the collateral depreciated."[41] Norton likewise makes it plain that if the property is not depreciating, "adequate protection payments are not appropriate."[42] Theoretically, the sum of the adequate protection and the reduced value of the collateral would equal the initial value of the collateral. Here, where the dairy has not depreciated according to the evidence, the adequate protection payments must be applied to the reduction of the lien because Met has received them and is not entitled to be paid a premium. In so holding, this Court is hardly a pioneer.[43]

In *In re Weinstein*,[44] the Ninth Circuit Bankruptcy Appellate Panel was confronted with a very similar case. There, the undersecured lender received adequate protection payments during the case

---

[41] Norton, § 35:5.

[42] *Id. See also Confederation Life Insurance Co. v. Beau Rivage Ltd.*, 126 B.R. 632 (N.D. Georgia, 1991)("If payments are made to an undersecured creditor, they must be allowed to reduce the allowed secured claim of the creditor. Otherwise the payments would be treated as interest payments or use value, in direct contravention of *Timbers* and § 506 [cites omitted]). The Court recognizes that, had all these payments been rents generated by the collateral, a different result might be indicated. *See, e.g. In re Union Meeting Partners*, 178 B.R. 664 (Bankr. E.D.Pa.,1995)(Holding that rents collected from collateral and remitted to secured creditor increase the creditor's secured claim because they are additional collateral).

[43] *See In re Weinstein*, 227 B.R. 284 (9th Cir. BAP 1998); *In re Star Trust*, 237 B.R. 827 (Bankr. M.D. Fla. 1999).

[44] 227 B.R. 284 (9th Cir. BAP 1998).

notwithstanding that the property securing the claim, the debtors' home, did not depreciate in value. The

lender elected §1111(b)(2) treatment. As Met does here, the lender in *Weinstein* urged the court to apply

the payments to the unsecured portion of its claim. Instead, the court found that the payments previously

made should be credited against the lender's allowed claim as a whole (essentially a down payment on the

total payment required under §1111(b)) as well as to reducing the amount of the secured claim.[45]

Recognizing that the pre-confirmation payments had a present value equal to their actual value, the balance

of the payments needed to have a present value equal to the value of the collateral less the previously-made

payments. The court in *Star Trust*, dealing with a similar factual scenario, reached the same result.[46]

     Met's concern here seems to be that this holding will prevent it from recovering all of the value of

its collateral when the eventual sale by the liquidating trust occurs and that the surplus, if any, will be

"diverted" to the unsecured creditors. Met apparently seeks to be repaid twice. If, as the courts in

*Weinstein* and *Star Trust* did, this Court applies the pre-confirmation payments to Met's claim as well as

to reducing Met's lien, and if the proposed Plan intends to repay the balance of Met's claim in a stream

of payments having a present value equal to the adjusted value of Met's lien, Met would unquestionably

receive what §1129(b) promises, payments totaling the amount of its claim and having a present value equal

to its lien.

     Met complains that it is entitled to receive interest. Met is certainly entitled to receive payments

which factor in a discount rate such that the stream of payments have a present value equal to its lien. Here,

the Plan provides for that rate to be national prime plus one percent. Met confuses the right to received

---

[45] *Id.* at 294-95.

[46] 237 B.R. 827, 838 (Bankr. M.D. Fla. 1999).

a discounted rate as part of its payments with the §506(b) interest that is paid to oversecured creditors. Met argues that its claim has become oversecured as a result of the post-petition payments. Yet, this argument ignores the need to make an accompanying credit against the amount of its lien. As set out above, accepting Met's argument pays it a bonus or premium that is neither fair nor equitable.

Met also suggests that the dairy has been allowed to depreciate during the case. Unfortunately, that argument is contrary to the evidence that the collateral is worth today what it was worth at the date of the petition.

Met asserts that ANB's Plan only pays Met what it would have received had it not elected. This argument is untenable. Met will receive not less than the allowed amount of its claim, both secured and unsecured. This is likely to be far better than Met would do as a non-electing creditor who would only receive the equivalent of the value of its collateral plus some small percentage of its unsecured claim.

The Court calculates that Met's allowed claim of $9,994,477.78 should be reduced to $8,826,517.96 by application of the post-petition receipts to principal.[47] The secured portion of its claim has been reduced from $9.282 million to $8,114,040.18. Once the outlots are sold and the proceeds applied, each of these figures will be further reduced, dollar for dollar. For now, Met would be entitled to a stream of payments totaling $8,826,517.96 having a present value of $8,114,040.18.

ANB's Plan contemplates interest-only payments of $49,649.16 per month for the first six months at 6.75% simple interest.[48] This would amount to payments of $297,894.96. Thereafter, Met would

---

[47] $9,994,477.78 - $1,167,959.82 = $8,826,517.96.

[48] On April 5, 2005, the national prime rate was 5.75 per cent. On March 5, the rate was 5.5 per cent. If the Court's order issued as of April 5, 2005, the plan rate would be fixed at 6.75 per cent. *See http://www.bankrate.com/brm/ratewatch/leading-rates.asp,* April 5, 2005.

receive amortized payments in the monthly amount of $60,983.43. In the next six months, Met would receive an additional $365,900.58, for total payments of $663,795.54 in the first year of the plan. The remaining balance of Met's claim would be $8.162 million[49] to which Met would be entitled when the dairy sold (less, of course, any other payments received by it).

The Court performed a time value calculation assuming that the first cash flow would be zero (on the effective date), and then adding six cash flows of $49,649.16 each (the interest-only payments), followed by six cash flows of $60,983 each (the principal and interest payments), followed by a final cash flow in the thirteenth month after confirmation of $8,162,722 (the remaining balance due on the allowed claim). The Court concludes that these flows would have a net present value of $8,227,722, well in excess of the $8.114 million adjusted lien amount. The payments total $8,826,517.96. If the dairy sells within thirteen months of confirmation, this stream of payments satisfies §1111(b)(2) and §1129(b)(2)(A)(i)(II).[50] Given that the amounts remaining due on both the allowed claim and the lien will be substantially reduced by the proceeds of the outlots, it is even more likely that the stream of payments will comply with § 1129(b)(2).

---

[49] $8,826,517.96 - $663,795.54 = $8,162,722.42.

[50] For the purposes of this Opinion, the Court assumed that the dairy would be sold within or immediately after one year from confirmation. The Court made these calculations on a Hewlett Packard "Business 10B" financial calculator. If the dairy were to sell sooner, more would be due on the allowed claim from the proceeds of the dairy. For instance, if the dairy were sold after only the six interest payments had been made, some $8.5 million would be due on the claim, but if that amount were paid at closing, the net present value of the six interest payments and one payment of $8.5 million would still have an approximate net present value of $8.49 million (well in excess of the amount of the lien). Conversely, if the dairy is not sold for 18 months after confirmation, the net present value of six interest payments, 12 amortizing payments, and the remainder of the allowed claim ($7.796 million) would only have a net present value of $7.983 million and, as such, would not meet the § 1129(b)(2) test, suggesting that a higher interest rate would be necessary.

Case 03-16743   Doc# 611   Filed 04/22/05   Page 21 of 29

Feasibility

The Court is satisfied that the dairy's operations as projected over the next year are feasible. After a year, it seems unlikely that the dairy will be able to continue as it does presently, at least without substantial operating capital. Section 5.1.11 of the plan contains the "Operating Directive" to the Liquidating Trust. The trustee will be directed to retain a broker to sell the dairy if a sale is not accomplished within 90 days of the effective date of the Plan and, if the dairy stands unsold within a year of the effective date, the trust will look to liquidating the dairy at auction. As the applicable time horizons do not far exceed a year, and retention by ownership for a lengthy period is not contemplated, the Court can find that the Plan is feasible, at least in the short term.[51]

The MDR Ballot

Met objects to ANB's having voted the interest of MDR in acceptance of the plan. The evidence showed that ANB obtained a judgment on the obligations underlying its claims here against MDR in Texas state court. It then registered that judgment under the Uniform Enforcement of Foreign Judgments Act and recorded same in the District Court of Hamilton County, Kansas.[52] That court issued a charging order under the Kansas Revised Limited Liability Company Act,[53] charging MDR's interest in Milk Palace with payment of ANB's judgment.[54] Therefore, ANB succeeded to MDR's interest in Milk Palace and properly voted same.

---

[51] Section 1129(a)(11).

[52] KAN. STAT. ANN. § 60-3001, et seq. (1994 and 2003 Supp.). *See* Ex. 16.

[53] KAN. STAT. ANN. § 17-7662, et seq. (2003 Supp.).

[54] KAN. STAT. ANN. § 17-76,113 (2003 Supp.).

22

The Third Party Injunction

Under ANB's Plan creditor *collection* of nondebtor guarantees would be partially and temporarily enjoined by the Court's powers under § 105.[55]   Met objects to this provision and contends that the bankruptcy court lacks jurisdiction to enter the stay or injunction of nondebtor actions because the guarantees are not sufficiently related to the bankruptcy.   Met also argues that guarantee enforcement actions will not interfere with debtor's attempt to reorganize because  no reorganization  is contemplated under ANB's Plan.

The Court reads the Plan's injunction provision as a limited one.  It does not enjoin guarantee enforcement actions and collection against certain guarantors, Michael Spini and MDR Management, LLC. With respect to enforcement of guarantees of other nondebtor third parties (generally, the Hatcher family interests), the injunction prohibits *collection* of a guarantor liability but does not prohibit a creditor from reducing its guaranty claim to judgment.  The stay on collection of a guarantor claim, moreover, is limited to a period of sixty (60) days, unless the Interest Owners[56] exercise their option to recapitalize Milk Palace and repurchase Milk Palace's assets from the Liquidating Trust during the sixty day period.[57]  In short, only if the Interest Owners purchase the estate and operate the dairy as the reorganized dairy, does the stay continue on collection, provided there is no default under the Plan.[58]

_____

[55]  Dkt. 497,  Article VII, p. 45.

[56]  The Interest Owners are defined as the members of Milk Palace Dairy, LLC and comprise Class 23 as listed in Article III, Section 3.3.23 of the Plan. Dkt. 497, Article I, Section 1.1.

[57]  Dkt. 497, Article VIII.

[58]  Ten (10) of eighteen (18) Interest Owners in Class 23, collectively having a 41.9021% interest, voted to accept the ANB Plan.  MDR Management, LLC voted to reject the ANB Plan but as noted in the previous section, MDR's interest has been assigned to ANB by virtue of the charging

23

Section 524(e) provides that discharge of a debt of the debtor does not affect the liability of any nondebtor for the debt. This provision generally permits creditors to pursue third party guarantors of the debtor's debt even if the debtor is discharged.[59]  Met argues that the Plan's injunction provision runs counter to this section of the Bankruptcy Code and the Court lacks jurisdiction to enter or enforce the injunction, citing *In re Digital Impact, Inc.*[60]  The Court notes that the temporary injunction in the Plan before it is distinguishable from the plan provisions before the court in *Digital Impact*. In that case, the plan contained a provision *permanently* releasing and discharging the plan proponent from any liability relating to his prepetition participation in the business of debtor. The plan proponent capitalized the reorganized debtor under the plan.

The temporary versus permanent nature of the plan provision dealing with nondebtor third parties may be an important distinction. Here, the Plan does not purport to permanently deprive creditors a right to recovery from nondebtor guarantors; it temporarily delays creditors' ability to collect from nondebtor guarantors. The Tenth Circuit in *In re Western Real Estate Fund, Inc.*,[61] appeared to view the permanent nature of the injunction an important distinction as well. There the bankruptcy court permanently enjoined an attorney from collecting the balance of his unpaid contingency fee from a settling non-debtor adverse third party under a state law attorney's lien provision.

---

order and therefore, MDR's ballot is not effective. Seven (7) Interest Owners did not vote. *See* Dkt. 548.

[59]  *See generally,* Norton, § 48:5.

[60]  223 B.R. 1 (Bankr. N.D. Okla. 1998).

[61]  922 F.2d 592 (10th Cir. 1990), *modified on other grounds sub nom. Abel v. West*, 932 F.2d 898 (10th Cir. 1991).

The second and more serious problem with the injunction is its explicitly permanent nature. The injunction was not issued merely to limit and simplify the legal entanglements of the debtor during development and evaluation of a reorganization plan, but also clearly to control in perpetuity the post-confirmation status of Abel's claim against PSO. By permanently enjoining Abel's action against PSO, the bankruptcy court, in essence, discharged PSO's liability to Abel under state lien law . . . we hold such a permanent injunction precluding Abel's attempt to recover any unpaid portion of his fee from PSO to be improper . . . [62]

Accordingly, we follow the Ninth Circuit's lead in *In re American Hardwoods, Inc.,* 885 F.2d at 621 and hold that while a temporary stay prohibiting a creditor's suit against a nondebtor (in *American Hardwoods,* the bankrupt's guarantor) during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) outlined above, the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. [63]

Even though the Court interprets the Plan's stay on certain guarantee enforcement actions to be a temporary one, one that delays collection rather than outright discharge of the guarantor liability, and is calculated to expire in sixty days if the Interest Owners opt to not repurchase the assets of the debtor from the Liquidating Trust and fund the reorganized debtor, the Court concludes that exercise of its inherent powers under §105(a) would be contrary to the explicit provisions of §524(e). [64] Section 524(e) clearly states that the debtor's discharge "does not affect the liability of any other entity" for the debt. Where a creditor objects to a plan provision purporting to eliminate, or even restrict, the creditor's right to enforce

---

[62] 922 F.2d at 660.

[63] *Id.* at 601-02.

[64] *See In re American Hardwoods, Inc.*, 885 F.2d 621 (9th Cir. 1989) (Bankruptcy court lacked jurisdiction and power to permanently enjoin creditor from enforcing state court judgment against nondebtor guarantors of chapter 11 debtor.); *In re Sunflower Racing, Inc.*, 226 B.R. 673, 691- 94 (D. Kan. 1998) (Bankruptcy court lacked power under §105 to terminate subordination agreements of nondebtor third parties (debtor's parent corporation and parent's chairman of the board) over objection of creditors.).

the liability of third parties for the debt, such a plan provision is not enforceable. Because Met objects to the Plan's injunction, it will not be bound by this part of the Plan.[65]

<u>Other Confirmation Elements</u>

The Court concludes that the remaining requirements for confirmation under § 1129 are satisfied as well. ANB's Plan complies with the applicable provision of the Bankruptcy Code.[66] No evidence was presented on the good faith requirement and the Court therefore finds that ANB's Plan is proposed in good faith and not by any means forbidden by law.[67] The initial liquidating trustee under the Liquidating Trust contemplated by ANB's Plan is Dave McCarty, the current manager of the Milk Palace dairy facility, with oversight by a trust committee comprised of representatives of creditors Met, ANB, Kit Carson State Bank, Caterpillar, the Unsecured Creditors' Committee, and a representative of the interest owners of debtor. ANB's Plan further discloses that the interest owners of Milk Palace will retain their ownership interest as a beneficial interest in the Liquidating Trust as well as the assignment to ANB of interest owner MDR Management, LLC's 41% interest in Milk Palace.[68] Finally, as discussed above in the treatment of Met's claim and its §1111(b)(2) election, the requirements of §1129(b)(2)(A) and §1129(a)(7)(B) are satisfied.

_____

[65] *See Trulis v. Barton*, 67 F.3d 779 (9th Cir. 1995) (Creditors who do not wish to release third party nondebtors should object to confirmation of debtor's plan that includes a release provision or they will be barred by the doctrine of *res judicata*); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (Creditor who failed to object to guaranty release provision in plan was foreclosed by *res judicata* from attacking confirmation order in subsequent litigation against guarantor).

[66] Section 1129(a)(1) and (2).

[67] Section 1129(a)(3).

[68] Section 1129(a)(5)

26

<u>Conclusion</u>

The Court values Met's collateral at $9,282,000 and therefore, Met's allowed claim of $9,994,477.78 is undersecured. Because Met is undersecured, it is not entitled to collect post petition interest or attorney fees. By virtue of its §1111(b) election, Met will be treated as a fully secured creditor in the amount of its allowed claim. The amounts Met has received post-petition and pre-confirmation as adequate protection payments and sale proceeds of collateral should be credited against Met's allowed claim as well as the secured portion of its claim. As set out above, Met's treatment under ANB's Plan is fair and equitable and complies with the requirements of §1129(b)(2)(A).

Amarillo National Bank's motion for cram down confirmation is GRANTED and the Second Amended Plan of Reorganization is CONFIRMED. ANB's counsel shall prepare and submit an appropriate Confirmation Order forthwith.

The parties are reminded that motions for reconsideration under Fed. R. Civ. P. 59(e), made applicable in bankruptcy by Fed. R. Bankr. P. 9023, are due no later than ten (10) days after entry of this Memorandum Opinion. Counsel are also reminded of the limited grounds warranting relief under Rule 59(e).[69] The Court imposes a page limitation of 10 pages for any such motion.

IT IS SO ORDERED.

# # #

**Appendix**

---

[69] *See Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir. 1991); *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

**Calculation of Milking Cow Capacity**

**Formula:**

60 minutes ÷ Number of minutes per rotation = Number of carousel rotations per hour

Number of carousel rotations per hour x 60 stalls on carousel = Number of cows milked per hour

Number of cows milked per hour x Efficiency percentage = Adjusted number of cows milked per hour

Adjusted number of cows milked per hour x Number of hours milking per day = Total number of cows milked per day

Total number of cows milked per day ÷ 3 (number of times milked per day) = Number of milking cows

**Example A:  Current Milk Palace Milking Cow Capacity**

**Milk Palace I:**
60 minutes ÷ 8 minute rotations = 7.5 rotations per hour
7.5 x 60 stalls  = 450 cows per hour
.80 efficiency x 450 = 360 cows per hour
360 cows x 22 hours = 7,920 total cows per day
7,920 ÷ 3 milkings per day = **2,640 milking cows**
**Milk Palace II:**
60 minutes ÷ 8 minute rotations = 7.5 rotations per hour
7.5 x 60 stalls  = 450 cows per hour
.80 efficiency x 450 = 360 cows per hour
360 cows x 19 hours = 6,840 total cows per day
6,840 ÷ 3 milkings per day = **2,280 milking cows**

**Total Milking Cows = 4,920**

**Example B:  Hutcheson Appraisal Milking Cow Capacity Assumptions**

**Milk Palace I:**
60 minutes ÷ 7 minute rotations = 8.57 rotations per hour
8.57 x 60 stalls = 514.20 cows per hour
.85 efficiency x 514 = 436.90 cows per hour

28

436 cows x 21 hours = 9,156 total cows per day
9,156 ÷ 3 milkings per day = **3,052 milking cows  (rounded down to 3,000 by Hutcheson)**
**Milk Palace II:**
2,710 lock-ups (wet cow pens) [735 lock-ups not used (dry cows)]
<u>x 113% crowding factor</u>
3,062 milking cows
.85 efficiency x 3,062 milking cows = **2,602 milking cows (rounded up to 2,800 by Hutcheson – opines that cows not properly trained in rotary carousel)**

**Total Milking Cows = 5,800**


**Example C: Gergens Appraisal**

**Milk Palace I:**
3,385 = number of lock-ups

Milk cows as a percentage of total cows typically runs 75-80%.
3,385 x .80% = 2,708 (rounded to 2,700 by Gergens)

However, the milk parlor size could not accommodate 2,700.  Gergen assumed a 360 cow capacity per hour (80% efficiency of 450 theoretical cow capacity per hour assuming 60 stall rotary, and 8 minute rotations).  360 cows x 21 hours = 7,560 cows milked per day ÷ 3 milking per day = **2,520 milking cows (rounded down to 2,500)**

**Milk Palace II:**
3,128 = number of lock-ups

The amount of pen size in MP II was insufficient for the number of lockups.  KSU recommends 500-700 sq feet of pen space per cow.  After dividing the square footage of the pens by the number of lock ups, the practical cow capacity was 3,030 (rounded down to 3,000).

Again, as in the case of MP I, the milk parlor cannot accomodate 3,000 cows but only 2,500 milking cows.  Thus, the capacity of MP II is the same = **2,500 milking cows.**

Total cow capacity = 6,500
**Total Milking Cows = 5,000 (77% of total cow capacity)**