**SO ORDERED.**

**SIGNED this 19 day of May, 2005.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| MILK PALACE DAIRY, LLC ) | Case No. 03-16743 |
| ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| _____) | |

**ORDER GRANTING IN PART AND DENYING IN PART**
**MET LIFE'S MOTION TO ALTER OR AMEND**

Metropolitan Life Insurance Company ("MetLife") filed a Motion to Reconsider and to Alter or Amend the Court's April 22, 2005 Memorandum Opinion (the "Motion").[1]  Amarillo National Bank ("ANB") filed a timely response and MetLife filed a reply.  The Court has reviewed the papers and its Memorandum Opinion and is ready to rule.

---

[1] MetLife's Motion is made pursuant to Fed. R. Civ. P. 59(e) and Fed. R. Bankr. P. 9023.

1

## Rule 59(e) Motions

Motions to alter and amend judgment serve a limited purpose. Such motions are only appropriate when a court has misapprehended the facts, a party's position, or controlling law.[2] It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.[3] Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law; (2) new evidence that was previously unavailable; and (3) the need to correct clear error or prevent manifest injustice.[4] In seeking relief on the basis of newly-discovered evidence, "the newly discovered evidence must have been in existence at the time of trial but not known to the movant.[5]

## MetLife's Motion

MetLife raises five points in its Motion. They may be loosely summarized as: (1) calculation of value of MetLife's allowed secured claim; (2) priority issue between MetLife and ANB regarding dairy equipment and irrigation equipment; (3) post-trial offers to purchase; (4) loss of value of water rights; and (5) ANB voting rights. The Court deals with them seriatim.

**1.    Calculation of MetLife's Allowed Secured Claim.**

The first issue, having to do with the manner in which the Court calculated the value of MetLife's allowed secured claim as of the date of confirmation, is meritorious. MetLife argues, appropriately, that

---

[2] *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[3] *Id.*; *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).

[4] *See Servants*, 204 F.3d at 1012; *Brumark Corp. v. Samson Resources, Corp.*, 57 F.3d 941, 948 (10th Cir. 1995).

[5] *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1529 (10th Cir. 1997).

2

in the process of applying what Met Life received post-petition in the form of adequate protection, collateral proceeds, and rent, the Court made an inadvertent double deduction. After reviewing the record and, in particular, ANB's Exhibit 14, the Court concludes that the appropriate calculation should be as follows.

MetLife's total allowed claim as of the date of the petition in this case is $9,994,477.78. MetLife's allowed secured claim should initially have been set at $9,565,756.22 before deductions for payments received by MetLife during the pendency of the case. In the Court's Memorandum Opinion at page 11, the Court found that the value of MetLife's collateral for confirmation purposes was $9,282,000, subject only to deductions for past due ad valorem taxes which are senior in priority. That figure was comprised of the Gergens appraisal number of $8,460,000 for the dairy (real estate and dairy equipment) and the "outlots" valued by both parties at $822,000. However, as of the petition date, MetLife's secured claim would also have included $283,756.22, the sale value of Lot 17 which was sold post-petition. Accordingly, before crediting any payments to either MetLife's allowed claim or secured position, its secured claim is valued at $9,565,756.22. From that amount should be deducted the proceeds of the Lot 17 sale ($283,756.22) and the payments of interest, rent, and other proceeds collected by MetLife post-petition ($884,203.60), for a total deduction of $1,167,959.82.[6] This leaves MetLife with a secured claim valued at $8,397,796.70.[7]

---

[6] *See* Memorandum Opinion, footnote 40 at p.17.

[7] The Court notes that when it made its calculation, it arrived at a secured claim value of $8,397,796.40 ($9,565,756.22 - $1,167,959.82). This is a .30 cent discrepancy with ANB Exhibit 14 which the Court presumes is due to rounding. Since the Court does not view this difference material to its analysis, the Court will utilize the figures from ANB Exhibit 14.

3

MetLife also asks that the Court add into its "starting" collateral value $33,696.14 which represents a lease payment on real estate subject to MetLife's mortgages. MetLife argues that its mortgages include assignments of rents and that the rents generated by its real estate collateral constitute additions to the value of its real estate collateral. In its Memorandum Opinion, page 18, footnote 42, the Court noted that some courts so hold, subscribing to the so-called "Addition Theory."[8] Other courts adhere to the so-called "Subtraction Theory,"[9] but, in this Court's view, the better position is the one taken by several courts that hold that rents are not credited to collateral value when they are expended during the course of the case, as occurred here, as a form of adequate protection or to preserve the property.[10] The Court declines to add the rent proceeds to the initial collateral value of MetLife.

MetLife also requests that the Court add to the starting value of its collateral the $46,625.29 it realized upon the foreclosure and sale of real property belonging to MDR Management L.L.C. The Court notes that this property was recovered by MetLife under a writ of execution issued under a state court judgment against MDR, not the debtor. This property was not property of the estate and Met Life's secured claim, prior to its § 1111(b) election, is measured by the value of its interest in the property of the estate. Therefore, the $46,625.29 should not be added to the initial collateral value.

In summary, after deductions from its allowed claim and the secured portion of its claim, the Court

---

[8] *See In re Union Meeting Partners*, 178 B.R. 664 (Bankr. E.D. Pa. 1995).

[9] *See In re Kalian,* 169 B.R. 503 (Bankr. D. R.I. 1994); *Confederation Life Ins. Co. v. Beau Rivage, Ltd.,* 126 B.R. 632 (N.D. Ga. 1991).

[10] *See In re Duval Manor Associates*, 191 B.R. 622, 632-34 (E.D. Pa. 1996) (summarizing cases adopting all three schools of thought on this point, but choosing the "dual valuation approach" whereby a debtor may use rents to decrease a creditor's claim).

4

calculates that MetLife's allowed claim of $9,994,477.78 should be reduced to $8,826,517.96 by application of the post-petition receipts to principal.[11] The secured portion of its claim has been reduced by a like amount from $9,565,756.22 to $8,397,796.70. Once the outlots are sold and the proceeds applied, each of these figures will be further reduced, dollar for dollar. Using the parties' stipulated appraisal value of $822,000, after application of the lots' proceeds, MetLife's allowed secured claim would be $8,004,518.26[12] and the secured portion of its claim would be $7,575,796.70.[13]

With the change in the calculation of the secured portion of MetLife's claim, the Court must now reassess the plan's treatment of MetLife's § 1111(b) election to ascertain if its treatment is fair and equitable under § 1129(b)(2). Because MetLife has made a valid § 1111(b) election, after application of the lots' proceeds, it must receive a stream of payments totaling not less than $8,004,518.26 and having a present value as of the effective date of the plan not less than $7,575,796.70. Neither party offered financial evidence to prove or to challenge ANB's conclusion that the treatment described in its Exhibit 14 would meet the present value requirement. ANB's analysis contemplated a sale of the dairy sometime within 12 months after the effective date. It proposed to pay interest on the secured portion of MetLife's claim ($7,575,796.70) at 6.50 per cent reflecting a one point adjustment of the national prime rate of 5.50 per cent at the time of the hearing. The rate has increased since that time and, as of the date of the Court's

---

[11] $9,994,477.78 - $1,167,959.82 = $8,826,517.96.

[12] The Court again notes the slight discrepancy between its calculation ($8,826,517.96 - $822,000 = $8,004,517.96) and ANB Exhibit 14 ($8,004,518.26) and accepts the figure from ANB Exhibit 14. *See* footnote 7, *supra.*

[13] *See* ANB Exhibit 14.

5

Memorandum Opinion, national prime was 5.75 per cent, increasing the plan rate to 6.75 per cent.[14]

ANB's Plan and its analysis contained in Exhibit 14, assuming the dairy is sold and MetLife's allowed secured claim is paid in full at that time, meet the requirement that the total of the payments made would equal or exceed the amount of MetLife's allowed secured claim of $8,004,518.26. It is not immediately clear from the evidence, however, that the stream of payments contemplated has a present value equal to $7,575,796.70, the net value of MetLife's collateral on the effective date, unless MetLife is to receive accrued interest at a reasonable rate on the unpaid portion of its allowed secured claim at the time of the dairy's sale.

ANB's proposed amortization of the actual value of MetLife's collateral at a market rate of interest would comply with § 1129(b)(2)(A)(I)(ii) had MetLife not made the § 1111(b) election. But because of that election, MetLife is entitled to a lien in the amount of its now-enhanced allowed secured claim. In order to clear MetLife's lien when the dairy is sold, MetLife will need to receive the balance remaining on its allowed secured claim, not what "remains" on the "secured portion" of its claim. Because of this, the Court's analysis should focus on whether the Plan would create an obligation to MetLife that has a present value of $7,757,796.70. This could be done by viewing MetLife's treatment as a note for $8,004,518.26, payable in the increments proposed in the Plan or on Exhibit 14, that amount to bear interest at a rate sufficient to insure that the present value of the payment stream as of the effective date would equal or

---

[14] On April 5, 2005, the national prime rate was 5.75 per cent. On March 5, the rate was 5.5 per cent. If the Court's order issued as of April 5, 2005, the plan rate would be fixed at 6.75 per cent. *See* http://www.bankrate.com/brm/ratewatch/leading-rates.asp, April 5, 2005.

exceed $7,757,796.70.[15] The Court notes that the rate necessary to accomplish this will be a much lower one than the 6.75 per cent *Till* rate MetLife would receive in an ordinary cramdown. When the Court attempted to calculate the present value of the payment stream on Exhibit 14 using a discount rate of 6.75 per cent, the net present value was less than $7.575 million whereas using a hypothetical 4.75 per cent discount rate, the present value of the stream exceeded $7.588 million. As *Collier* states, "The solution lies in a below-market rate of interest [on the allowed secured claim]."[16] The stream of payments that ANB has proposed meets both the totality of payment requirement and the present value requirement.[17]

### 2. Priority Issue.

MetLife complains that the Court has "confused" the priority disputes between MetLife and ANB by generally stating in the facts on page 3 of the Memorandum Opinion that "Met also claims a second security interest in debtor's dairy and irrigation equipment. . . ." The Court intended merely to recognize that MetLife has always asserted at least a second priority interest in personal property dairy collateral other than that affixed or incorporated into the dairy real estate. The Second Amended Plan clearly

---

[15] *See* Pusateri, Swartz and Shaiken, *Section 1111(b) of the Bankruptcy Code, How Much Does the Debtor Have to Pay and When Should the Creditor Elect?* 58 AM. BANKR. L.J. 128, 140-141, 147-49 (1984) (hereafter "Pusateri"). *See also* Lawrence P. King, 7 COLLIER ON BANKRUPTCY, ¶ 1111.03[6][b] (15th Ed. Rev. 2005) (hereafter "Collier").

[16] COLLIER, ¶ 1111.03[6][b], p. 1111-37.

[17] Paying the market rate of 6.75 per cent on the $8,004,518.26 note balance would certainly meet the present value test, but would also result in MetLife receiving more than would be required to meet the present value test at the expense of the lower classes of debt. *See* Pusateri at p.141 ("Of course, the debtor must also bear in mind that if a junior class dissents, the secured creditor cannot receive more than the full amount of its claim."). No junior class dissented here.

reserves any outstanding priority disputes between MetLife and ANB for future determination.[18] No evidence was offered at trial that would bear on that determination at confirmation. The Memorandum Opinion should be altered to reflect the Court's approval of the Plan's reservation of that issue.

### 3. Post-trial Offers to Purchase.

MetLife next asserts that the intervening offers the parties have received *since* trial demonstrate that the Court's valuation of the collateral was in error; and, at a minimum, require that the Court alter its Memorandum Opinion to find that the dairy property may be valued in a range between the Gergens appraisal and the Hutchison appraisal. MetLife argues that failing to do this somehow impairs MetLife's right to credit bid. MetLife either misunderstands or misstates the Court's statement on page 22 of its Memorandum Opinion concerning "issuing a directive" to the Liquidating Trust to liquidate within one year of confirmation. In fact, those are the precise terms of the Liquidating Trust as set forth in the Plan in its "Operational Directive" found in Section 5.1.11. The Court cannot review the offers received by the parties after trial. This is not "newly discovered" evidence; rather, it is post-trial evidence that could not have been presented to the Court at trial and therefore is not admissible now to attack the Court's judgment.[19] Moreover, as the Memorandum Opinion clearly states, while finding a range of value might be advantageous to MetLife, the Court did not find the Hutchison appraisal credible. Thus, there is no *credible* evidence in the record upon which this Court could set a top bound in the range of values.

---

[18] *See* Dkt. 497, p. 40, § 5.6.3(b); Dkt. 498, p. 37, § 5.8(b).

[19] *See Wolfgang v. Mid-America Motorsports, Inc.,*, 111 F.3d 1515, 1530 (10th Cir. 1997) (The newly *discovered* evidence must have been in existence at the time of trial; otherwise it is properly ignored.).

8

MetLife's "credit bid" argument simply makes no sense where, as here, it will be entitled to insist that its mortgages be paid off in the amount of its allowed secured claim (*i.e.* its allowed claim), before releasing them. Nothing in the Memorandum Opinion impairs that right. Moreover, if MetLife believes that the price offered for the dairy is too low, it can bid its debt or a portion thereof according to its business judgment. As of confirmation, that debt equals, but does not exceed, $8,826,517.96 which is not only MetLife's total claim, but also its allowed secured claim. Section 1111(b)(2) was devised to protect creditors from cram down in a down market by allowing them to force debtors to pay their claim in full or surrender the property. It protects a creditor's "upside," but not beyond the creditor's actual debt. While there is no doubt that MetLife is entitled to realize its collateral's full value, MetLife is not entitled to collect more than it is owed. This part of MetLife's Motion is denied.

### 4. Water Rights

MetLife asserts that because it thought Milk Palace's water rights were valid when it made the loan and at the date of the petition, it is entitled to adequate protection of the "loss of value" it suffered upon learning the rights were not properly perfected. This argument is contrary to the record. Both MetLife's and ANB's appraisers appraised the dairy as though it had valid water rights. In accepting ANB's value, the Court inherently recognized, albeit with some hesitation, the value of the hypothetical water rights. To state that "it is this omission [of the water rights value] that was a factor in ANB's appraiser lowering the value and a key factor in the Court's Opinion" is flat wrong. This portion of MetLife's Motion is also denied.

### 5. Voting Rights.

Finally, MetLife states that the Court has effectively empowered ANB to dominate the Liquidating

9

Trust Committee by its finding that ANB was, by virtue of a charging order entered in state court in its favor and against MDR Management, L.L.C., permitted to vote MDR's interest in accepting the plan. This Court confused the invalidity of MDR's rejecting ballot with ANB's alleged right to vote such a ballot.[20] The Memorandum Opinion is therefore altered and amended as follows.

MDR voted a ballot rejecting the Plan.[21] ANB has a valid charging order against MDR's interest in the debtor. Under KAN. STAT. ANN. § 17-76,113 (2003 Supp.), the recipient of a charging order has the equivalent of an assignment of the member's interest in the company. KAN. STAT. ANN. § 17-16,112(b) (2003 Supp.) sets out what rights an assignee and an assignor have with respect to the assigned or charged interest. While an assignee (*i.e.* ANB) is not entitled to exercise the rights and powers of a member (*i.e.* MDR), a "member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited liability company interest."[22] This statute makes plain that MDR's voting a ballot is in fact an exercise of power that MDR lost when the charging order was entered. This is a different finding from that in the Memorandum Opinion suggesting that ANB could in fact vote MDR's interest which, on the record before the Court, is not the case.[23] Upon

---

[20] The Court notes that at footnote 58, page 23 of the Memorandum Opinion, it recognized that the MDR ballot was invalid; this is inconsistent with the statement on page 22 that ANB could vote MDR's interest.

[21] *See* Dkt. 548.

[22] KAN. STAT. ANN. § 17-76,112(b)(3) (2003 Supp.).

[23] As KAN. STAT. ANN. § 17-76,112(b) suggests, the operating agreement of Milk Palace may provide for an assignee to have more management rights and powers than the statute alone affords. The operating agreement of the debtor is not in evidence in the confirmation proceeding and the Court accordingly makes no finding thereon. The Court recognizes MetLife's argument in its Reply that the Hamilton County District Court has declined to allow ANB to execute on the MDR interest as of April, 2005 (well after the record was closed on this contested matter), but concludes that the state court's

review of the certificate of voting filed by ANB, the Court concludes that the exclusion of the MDR ballot does not change the Court's conclusion that a requisite majority of the interest holders accepted the Plan. Indeed, all of the other interest-holders who voted accepted the plan, MDR's being the only rejecting ballot. In short, the requirements for acceptance set out in § 1126(d) are met.

In the instant motion, MetLife objects to ANB's attempt to use its charging order to represent MDR's interest on the Liquidating Trust Committee, thereby dominating it to MetLife's and the other creditors' disadvantage. In its confirmation objection, MetLife stated:

> The Plan improperly grants ANB any payments otherwise due MDR Management LLC as ANB purports to be an oversecured creditor and MetLife holds a judgment against MDR granted in the Hamilton County foreclosure proceeding.[24]

The confirmation objection does not mention the trust committee's membership. MetLife did not allude to the trust committee issue in its Objection to Motion for Cramdown, nor did it mention this in its pre-trial memoranda. Only in its disclosure statement objection did MetLife raise this objection[25]. At the pretrial conference on February 8, 2005, MetLife's counsel announced it would withdraw the disclosure statement objection. No evidence was presented at trial concerning ANB's alleged dominance of the trust committee or its potential oppression of MetLife's interests. Therefore, the trust committee domination objection raised in the instant Motion was not before the Court at trial and this Court may not consider it in a Rule 59 context.[26]

---

findings do not affect the issue of the invalidity of the MDR ballot.

[24] Dkt. 531.

[25] Dkt. 530.

[26] *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).

11

MetLife's complaint about this is premature. The confirmation of the ANB Plan will not be final until the entry of this Order and the appropriate confirmation order. At that time, the trust committee will be established and will be comprised of between three and seven members, including ANB, MetLife, Kit Carson State Bank, the Unsecured Creditors Committee, Caterpillar, and a representative of the interest owners.[27] Under Section 11.1(e) and (i) of the Plan, the Court will retain jurisdiction to enter any orders necessary to consummate the Plan.[28] Complaints about the manner in which the Liquidating Trust is conducting its business will be better brought to the Court's attention in that context than in the guise of a Rule 59(e) motion. That said, the authority of ANB to claim MDR's "interest holder" seat on the trust committee by virtue of its "assignee" status is questionable given the provisions of the Kansas Revised Limited Liability Company Act discussed above.

## Conclusion

The Memorandum Opinion entered by this Court on April 22, 2005 is altered and amended as set forth herein but remains in every other respect the Opinion of the Court.[29] MetLife's Motion is accordingly GRANTED IN PART AND DENIED IN PART. The parties are directed to present to the Court an Order on Confirmation in conformity with this Order and the Memorandum Opinion.

IT IS SO ORDERED.

# # #

---

[27] *See* Dkt.497, Second Amended Plan, § 5.1.1 (establishment of Liquidating Trust) and § 5.1.7 (establishment of Trust Committee to oversee the liquidating trustee).

[28] Dkt. 497, p. 48.

[29] The Court notes that the Memorandum Opinion also recites an incorrect date of the trial of this matter. Trial was held February 23, 2005, not February 23, 2004. *See* Memorandum Opinion, p. 2. The Memorandum Opinion is amended to reflect this correction as well.

13